**In re U.S.A. INNS OF EUREKA SPRINGS, ARKANSAS, INC., Debtor.**

**Claude R. JONES, Plaintiff,**

v.

**UNITED SAVINGS AND LOAN ASSOCIATION, Defendant.**

**Civ. No. 92–3106.**

United States District Court, W.D. Arkansas, Harrison Division.

Feb. 12, 1993.

## MEMORANDUM OPINION

H. FRANKLIN WATERS, Chief Judge.

Currently before the court for disposition is an appeal of the bankruptcy court's decision in the above styled matter. The bankruptcy court, after conducting a trial on November 11, 1991, and taking the issues under advisement, by memorandum opinion entered on September 30, 1992, 151 B.R. 486, found that the appellant, United Savings and Loan Association, failed to prove one of the three essential elements needed to establish the applicability of 11 U.S.C. § 547(c)(2) (1988), and therefore, pursuant to 11 U.S.C. § 547(b) (1988), the appellee, Claude R. Jones, Trustee, is entitled to a preferential transfer judgment against the appellant for $63,000.00. After careful consideration of the decision issued by the bankruptcy court, this court believes that the judgment should be reversed and the matter remanded for further action consistent with this opinion.

### A. Jurisdiction

A United States' district court has jurisdiction to entertain appeals from final orders entered by a bankruptcy judge pursuant to 28 U.S.C. § 158(a) (1992), and thus jurisdiction properly has been asserted. This court is also the proper venue for appellant's appeal pursuant to the dictates of § 158(a).

### B. Issues Before the Court for Consideration

Appellant has raised two issues for consideration in the appeal of this matter. First, appellant submits that the bankruptcy court erred in its application of 11 U.S.C. § 547(c)(2)(C) to the facts of this case. Second, appellant submits that the bankruptcy court erred in finding that appellant failed to prove the payments in issue were made according to ordinary business terms.

### C. Standard of Review

■ A bankruptcy court's conclusions of law are subject to *de novo* review by the district court, which must make an independent determination of the applicable law and accuracy of the legal conclusions adopted by the bankruptcy judge. *See*

Steven B. Davis, Davis & Goldie, Harrison, AR, for Claude Jones.

Gail Inmann Campbell, Walker, Campbell, Campbell & Crawford, Harrison, AR, for United Sav. and Loan Ass'n.

*Matter of Bonnett*, 895 F.2d 1155 (7th Cir. 1990). Appellants' first issue, the bankruptcy court's interpretation and application of 11 U.S.C. § 547(c)(2)(C), is properly characterized as a matter of law and thus reviewed *de novo.*

■ The factual findings of a bankruptcy court, whether based on oral or documentary evidence, are reviewed under the "clearly erroneous" standard. Bankruptcy Rule 8013 (1992); *See Logan v. Basic Distribution Corp. (In re Fred Hawes Organization, Inc.),* 957 F.2d 239, 242 (6th Cir. 1992), citing *Yurika Foods Corp. v. United Parcel Service,* 888 F.2d 42, 45 (6th Cir. 1989). A finding is "clearly erroneous" when although there is evidence to support it, the court reviewing the entire evidence is left with the definite and firm conviction that a mistake has been committed. *Lovett v. St. Johnsbury Trucking,* 931 F.2d 494, 500 (8th Cir.1991), quoting *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 541, 92 L.Ed. 746 (1948); *In re LeMaire,* 898 F.2d 1346, 1349 (8th Cir.1990) (*en banc*). Thus, the appellant's second issue for review, the court's factual finding that appellant failed to prove that the payments in issue were made according to ordinary business terms, is subject to review under the clearly erroneous standard.

### D. Statement of the Case

The stipulated record reveals the following: On July 31, 1985, Eureka Motel, a joint venture, made and delivered to United Savings and Loan Association (hereinafter United) a promissory note in the principal sum of $2,700,000.00. The promissory note was secured by a mortgage interest in Eureka Motel and a security interest in all of the furniture, fixtures, equipment and inventory of Eureka Motel, both of which were properly perfected. Eureka Motel thereafter failed to make timely payments under the terms of the agreement and a foreclosure action was initiated by United in the Chancery Court of Carroll County, Arkansas.

On August 10, 1988, while the note was in default, Eureka Motel entered into an agreement to sell and convey the collateral to the debtor, U.S.A. Inns of Eureka Springs, Arkansas, Inc. (hereinafter USA Inns). United was not notified of the transaction until after it was consummated. Under the terms of the agreement, USA Inns agreed to pay Eureka Motel the sum of $3,625,000.00 for the collateral, of which $30,000 was paid in cash and the remainder paid by assumption of Eureka Motel's indebtedness. On November 10, 1988, USA Inns entered into an agreement with United, whereby USA Inns agreed to assume and pay the aforementioned indebtedness of Eureka Motel to United, totaling $2,795,437.33.

USA Inns failed to make timely payments under the terms of the assumption agreement, and on June 12, 1989, United exercised its option to accelerate the entire indebtedness and declare the entire balance under the terms of the promissory note and assumption agreement immediately due and payable. On June 10, 1989, a qualified appraiser retained by United had appraised the fair market value of the collateral at $2,620,000.00. Thereafter, on October 4, 1989, United filed foreclosure proceedings against USA Inns and on October 10, 1989, USA Inns filed its bankruptcy petition under Chapter 11 of the U.S. Bankruptcy Code. As of the date of the bankruptcy petition, USA Inns was indebted to United in the amount of $2,815,037.65.

Thereafter, on November 8, 1989, USA Inns filed an action seeking to recover, *inter alia,* payments made to United during the ninety-day period prior to the filing of the aforesaid Chapter 11 petition. During the ninety-day period, USA Inns made payments to United as follows:

| DATE | AMOUNT |
|---|---|
| 07–14–89 | $ 6,538.45 |
| 07–21–89 | 6,461.55 |
| 07–26–89 | 7,000.00 |
| 08–01–89 | 1,845.37 |
| 08–01–89 | 11,154.63 |
| 08–08–89 | 2,642.19 |
| 08–17–89 | 7,357.81 |
| 08–18–89 | 966.30 |
| 08–18–89 | 5,233.70 |
| 08–25–89 | 3,800.00 |
| 09–01–89 | 10,000.00 |
| **TOTAL** | $63,000.00 |

As of September 30, 1991, the total assets of the bankrupt estate consisted of a bank account with a balance of $5,183.61 and a claim for the recovery of preferential transfers against United for $63,000.00.

### E. Bankruptcy Trial

On November 8, 1991, a trial was conducted on the matter of the alleged preferential transfers by USA Inns to United. The question for adjudication was whether the payments made by USA Inns, totaling $63,000.00, were received by United under the exception to preferential transfers as provided by 11 U.S.C. § 547(c).

Section 547(b) states that certain transfers made within a period preceding the petition for bankruptcy may be avoided as "preferences." 11 U.S.C. § 547(b) (1988). Under section 547(b), a bankruptcy trustee may avoid the transfer to a creditor of an interest in property by the debtor that is made (1) on or within 90 days before the date of the filing of the bankruptcy petition, (2) while the debtor was insolvent, (3) on account of an antecedent debt, and (4) which enables the creditor to receive more than it would have received in a bankruptcy liquidation. The parties stipulated that under the facts and circumstances of this matter the requisite elements are present to constitute a preference under section 547(b).

However, the Bankruptcy Code permits the transferee of a preferential payment to prevent avoidance of the transfer by satisfying three requirements set forth in 11 U.S.C. § 547(c)(2).[1] Section 547(c) states in pertinent part that:

(c) The trustee may not avoid under this section a transfer—

\* \* \* \* \* \*

(2) to the extent that such transfer was—

(A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;

(B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and

(C) made according to ordinary business terms;

\* \* \* \* \* \*

11 U.S.C. § 547(c)(2) (1988).

During trial the bankruptcy court received the stipulated record on behalf of the trustee, Claude R. Jones, and testimony from J.C. Benage, chairman of the board, president, and chief executive officer of United. Mr. Benage testified that Eureka Motel entered into an agreement with USA Inns whereby Eureka Motel transferred its interest in loan collateral to USA Inns in August of 1989. He testified that United did not learn of the transfer in interest to USA Inns for almost two months, but thereafter, reluctantly entered into an assumption agreement with USA Inns, whereby United opted to forego its right to exercise a due-on-sale clause contained in its agreement with Eureka Motel.

Mr. Benage testified that USA Inns then failed to make timely monthly payments of $27,000.00 pursuant to the assumption agreement with United. He stated, however, that United, recognizing that the motel business in Eureka Springs, Arkansas is a seasonal cash flow business, decided not to call the loan for failure to make timely payments because the contract was made, the business was in place, and United's board decided that it was in the "best interest of United" not to call the loan. Mr. Benage also testified that United was encouraged and directed by regulatory authorities to work with customers in the "so-called real estate crisis that's going on across this country" and that this was another reason why the loan was not called:

Q: Now, Mr. Benage, I have asked you to tell the Court about United's course of dealing with this debtor and its late payments that were established through that course of dealing as reflected on the schedule 1 there of Defendant's Exhibit One. Now I would ask you to tell the Court whether or not, based upon your

---

**1.** The Supreme Court recently held that section 547(c)(2) may apply to long-term debt. *See*

*Union Bank v. Wolas,* —— U.S. ——, 112 S.Ct. 527, 116 L.Ed.2d 514 (1991).

personal knowledge of 36 years in the S & L business and more recent times in the real estate crisis, whether or not the manner in which United conducted itself in dealing with this debtor on a late-payment basis was in accordance with ordinary business terms in the S & L for this type of real estate trouble loan that you've been describing.

A. Counselor, it absolutely is, and that's something that we do and have done for years. We continue to do it. And the alternative is to do something worse, as most of us know. And the Judge, your Honor here, sees a good many of them in bankruptcies, because in some cases, I think, the financial people are reluctant to work with folks. And it's our duty, and we're mandated to do it—I mean that sincerely—by the regulatory authorities to work with people as long as they're making [an] attempt to pay and trying to pay, even though they may be in default. And that has been our position and is still our position today.

Mr. Benage further testified that the manner in which USA Inns paid United "could be ordinary on those accounts ... where there's default, delinquency and there's a workout process...." He stated that "probably eight to ten percent" of United's accounts are on a similar pay schedule.

The court found that United had established the first two requirements of section 547(c)(2), that (A) "the debt was incurred by the debtor in the ordinary course of business or financial affairs of the debtor and United," and that (B) "the debtor's late payments, and United's acceptance of those late payments, was the ordinary course of business or financial affairs between the two parties." The court determined, however, that "United failed to prove that the payments were made according to ordinary business terms," the requirement of section 547(c)(2)(C).

Citing *Logan v. Basic Distribution Corp. (In re Hawes Organization)*, 957 F.2d 239 (6th Cir.1992), the court stated that section 547(c)(2)(C) "requires an objective determination whether the payments

are ordinary in relation to standards prevailing in the relevant industry." While noting that Mr. Benage testified that "it is the regular practice in the industry to work with delinquent customers as long as some type of payment is forthcoming," the court stated that "United introduced no evidence regarding 'ordinary business terms' of the industry in general." The court continued, citing *Lovett v. Johnsbury Trucking*, 931 F.2d 494 (8th Cir.1991), for the proposition that the debtor's payment patterns must be contrasted "with the industry as a whole." The court found that United had presented

no evidence that late note payments are so common within the savings and loan industry that it is considered an ordinary business practice. In fact, Benage testified that at least 90% of United's customers remain current on their note payments. (citation to record omitted). Therefore, United failed to prove that the payments were made according to ordinary business terms.

Thus, the court found that "United has failed to prove one of the three essential elements needed to establish the applicability of 11 U.S.C. § 547(c)(2) (1988)" and ordered that "pursuant to 11 U.S.C. § 547(b) (1988), the trustee is entitled to a judgment against United for $63,000.00."

### F. Review of the Bankruptcy Court's Decision

The court stated in its opinion that section 547(c)(2)(C) "requires an objective determination whether the [late] payments are ordinary in relation to the standards prevailing in the relevant industry," citing *Logan v. Basic Distribution Corp. (In re Hawes Organization)*, 957 F.2d 239 (6th Cir.1992) and *Rieser v. Bruck Plastics Co. (In re Trinity Plastics, Inc.)*, 138 B.R. 203 (Bankr.S.D.Ohio 1992). The court concluded that there was no evidence presented with respect to the ordinary business terms within the savings and loan industry, stating that

Benage testified that the Office of Thrift Supervision directed United to work with delinquent customers during the "so-called real estate crisis...." (citation omitted). He stated that it is reg-

ular practice in the savings and loan industry to work with delinquent customers as long as some type of payment is forthcoming. Although United confirmed that this practice may be the general industry standard as to delinquent customers, United introduced no evidence regarding "ordinary business terms" of the industry in general.

In *Lovett*, the Eighth Circuit contrasted the debtor's payment with the industry as a whole. 931 F.2d at 499. There, the evidence established that late payments were so common in the entire trucking industry, the practice was considered "ordinary business." *Id.* Here, United presents no evidence that late note payments are so common within the savings and loan industry that it is considered an ordinary business practice. In fact, Benage testified that at least 90% of United's customers remain current on their note payments. (citation omitted). Therefore, United failed to prove that the payments were made according to ordinary business terms.

Thus, the court determined that section (c)(2)(C) had not been satisfied and the preferential transfer was therefore recoverable by the estate.

Appellant's first contention on appeal is that the "bankruptcy court's conclusion that United failed to prove the payments at issue were made according to ordinary business terms was based on an erroneous interpretation of Section 547(c)(2)(C)." Appellant's Brief, p. 7. Appellant states that the bankruptcy court determined that "unless late payments are so common in an industry as to be considered the norm, such payments cannot be considered as having been made in the ordinary course of business under Section 547(c)(2)(C)." *Id.* Appellant contends that the court applied the incorrect test under controlling Eighth Circuit law, citing *Lovett v. St. Johnsbury Trucking*. Appellant points out that the court in *Lovett* looked to the parties' dealings prior to and during the preference period as evidence of "ordinary business terms," expressing doubt as to whether subsection (c)(2)(C) required any comparison between the payment record of the

debtor and the general practice of the industry. Appellant's Brief, pp. 8–9. The appellant contends that the *Lovett* decision is in concurrence with a body of caselaw holding that subsection (c)(2)(C) does not require analysis of the industry as a whole, citing cases from the Eleventh Circuit. Appellant's Brief, p. 9.

Appellant further asserts that even if subsection (c)(2)(C) requires an objective comparison of the payments at issue in light of the general practices of the relevant industry, the bankruptcy court erred because while it found that the payments were in accord with the general industry standard, the court concluded that there was no evidence that the payments were made according to ordinary business terms. Appellant contends that if subsection (c)(2)(C) requires an objective comparison to the industry, no proof is required beyond establishing accordance with industry standards. Appellant's Brief, pp. 10–12.

Appellant's second contention is that even if the bankruptcy court properly applied the relevant law, the court's finding that United failed to carry its burden of proof is clearly erroneous. Appellant's Brief, p. 14. Appellant states that, similar to the evidence presented in *Lovett*, the evidence at trial established that the manner, form, and timing of the payments at issue were consistent with the practice both parties followed previously. Appellant's Brief, p. 15. Appellant further states that the uncontradicted testimony of Mr. Benage set forth the industry standards for late payments in the savings and loan business and illustrated that United's actions with respect to the USA Inns' note comported with industry standards. Appellant's Brief, p. 16.

Appellee asserts that the bankruptcy court correctly applied the law to the facts and circumstances of this case. Appellee's Brief, p. 2. Appellee contends that subsection (c)(2)(C) "requires an objective determination as to whether the transaction deviates from the practices or standards of the particular industry," and that appellant failed to meet that burden. Appellee's Brief, p. 2. Appellee first argues that "or-

dinary business terms" cannot "be determined by what is ordinary between the two parties to the transaction" because the court in *Lovett* found that not only were late payments the practice of the parties but also that late payments were common in the trucking industry. Appellee's Brief, p. 4.

Appellee next argues that whether the manner, form and timing of the payments were consistent with the prior practices of the parties is exactly the type of subjective determination required to establish subsections (c)(2)(A) and (c)(2)(B), and to require nothing more to establish subsection (c)(2)(C) "would effectively remove the third element from consideration." Appellee's Brief, p. 5. Appellee states that "[i]t is a familiar rule of statutory construction that a statute should not be construed in such a manner as to render it partly ineffective," asserting that adoption of appellant's proposed construction of the statute would do just that. Appellee's Brief, p. 5.

Appellee last contends that appellant's "proof fell far short of establishing that the transaction at issue was in accordance with 'ordinary business terms.'" Appellee's Brief, pp. 5–6.

■ After an examination of the briefs submitted by the parties, as well as the relevant Eighth Circuit precedent, which this court is of course bound to follow, we are convinced that the bankruptcy court erred in its application of the requirements of section 547(c)(2)(C). The Sixth, Third, and First Circuits have adopted the position espoused by the appellee, requiring fulfillment of each of section 547(c)(2)'s three subsections to receive benefit of the section. *See Logan v. Basic Distribution Corp. (In re Fred Hawes Organization, Inc.)*, 957 F.2d 239 (6th Cir.1992); *J.P. Fyfe, Inc. v. Bradco Supply Corp.*, 891 F.2d 66 (3d Cir.1989); *WJM, Inc. v. Massachusetts Dept. of Pub. Welfare*, 840 F.2d 996 (1st. Cir.1988). The Court of Appeals for the Sixth Circuit set forth its analysis

in the case of *Logan v. Basic Distribution Corp. (In re Fred Hawes Organization, Inc.):*

> The two subsections of § 547(c)(2) under review comprise a subjective and objective component respectively. The subjective prong (subsection (B)) requires proof that the debt and its payment are ordinary in relation to other business dealings between *that* creditor and *that* debtor. The objective prong (subsection (C)) requires proof that the payment is ordinary in relation to the standards prevailing in the relevant industry.

957 F.2d at 244, citing *WJM, Inc.*, 840 F.2d at 1010–11. The Sixth Circuit panel found that "Congress clearly intended to establish separate, discrete, and independent requirements which a creditor would have to fulfill to prevent avoidance ... and to hold otherwise would not only ignore the clear language of the statute, but would effectively render subsections (B) and (C) superfluous to each other." *Id.* 957 F.2d at 244. In its opinion, the bankruptcy court specifically adopted this interpretation of the requirements of subsections (c)(2)(B) and (c)(2)(C).

The Court of Appeals for the Eighth Circuit, in accordance with appellant's position, effectively has ignored the distinction between subsection (c)(2)(B) and (c)(2)(C), concluding that both subsections were satisfied so long as the late payments were consistent with the course of dealings between the debtor and creditor. *Lovett v. St. Johnsbury Trucking*, 931 F.2d 494 (8th Cir.1991); *but see White v. Bradford (In re Tax Reduction Institute)*, 148 B.R. 63 (Bankr.D.C.1992) (calling into question the holding of *Lovett* with respect to subsection (c)(2)(C) and characterizing the court's discussion as "gratuitous dictum.").[2]

In *Lovett,* the bankruptcy trustee of International, a freight consolidator and distributor, brought suit against St. Johnsbury Trucking, a common carrier, to recov-

---

**2.** For a thorough discussion of the requirements of the ordinary course of business defense, see Andrew N. Herbach, *Bankruptcy Preferences: New Developments in the Ordinary Course of Business Exception,* 60 Wisc.B.Bull. 25 (1987)

and David A. Ontko, *Ordinary Business Terms Must Not Be Ignored: The Forgotten But Critical Role of § 547(c)(2)(C) in the Ordinary Course of Business Exception to the Preference Rules,* 6 Bankr.Dev.J. 429 (1989).

er amounts avoidable as preferences under section 547(b). *Id.* at 496. During the 90–day period prior to filing its bankruptcy petition, International had paid St. Johnsbury Trucking $245,883.96 for services rendered pursuant to an agreement among the parties and the trustee's action sought, *inter alia*, recovery of those payments. *Id.* St. Johnsbury Trucking asserted that the payments were made in the ordinary course of business and therefore, were not recoverable. While the parties conceded that subsection (c)(2)(A) was met, as the debt of International was incurred in the ordinary course of its business dealings with St. Johnsbury Trucking, the bankruptcy court found that subsections (c)(2)(B) and (c)(2)(C) were unmet as the payments had not been made in the "ordinary course of business" or not made according to "ordinary business terms." *Id.* The bankruptcy court found that the payments constituted recoverable preferences and the district court affirmed. *Id.*

A panel for the Eighth Circuit found that the factual determinations of the bankruptcy court were clearly erroneous and the legal conclusions incorrect. *Id.* at 497. The court first looked to subsection (c)(2)(B)'s requirement that the payment be made in the "ordinary course of business." The court acknowledged that "there is no precise legal test which can be applied in determining whether payments by the debtor during the 90–day period were made in the ordinary course of business; rather, the court must engage in a peculiarly factual analysis." *Id.* (citations omitted). The court further recognized that the "cornerstone of this element of a preference defense is that the creditor needs demonstrate some consistency with other business transactions between the debtor and the creditor." *Id.* (citations omitted).

Looking to the evidence before the bankruptcy court, the Court of Appeals Eighth Circuit determined that although the parties' agreement required payments to be made within 30 days of delivery, the average number of days between delivery and payment was 62 days for the twelve month period prior to bankruptcy and 52 days for the 90–day period immediately prior to filing the bankruptcy petition. *Id.* at 498. The court concluded that "the 12–month period fairly reflected the parties' ordinary course of business," and therefore, International's late payments had been made in the ordinary course of business, fulfilling the requirements of subsection (c)(2)(B). *Id.* at 499.

The court then turned to subsection (c)(2)(C), stating that "[n]either the bankruptcy court nor the district court separately discussed the requirement in subsection (c) that to satisfy the ordinary-course-of-business defense, the payments during the 90–day period also must have been 'made according to ordinary business terms.'" The court found that St. Johnsbury did prove that the payments were made according to "ordinary business terms" and that "any contrary finding of the bankruptcy court was clearly erroneous." *Id.* at 499. The court stated that

International's payments to St. Johnsbury during the 90–day period were made "according to ordinary business terms" because the manner, form, and timing of these payments were consistent with the practice both parties followed previously. As noted, the record shows that International regularly and frequently sent St. Johnsbury checks covering a number of invoices for services rendered. The fact that most of the payments were not made within 30 days is, for the reasons given in Part II.B, not inconsistent with their having been "made according to ordinary business terms."

To the extent, *if any*, that subsection (c)(2)(C) requires comparison between the payment record of a particular debtor and the general practices in the industry regarding the time of payment, St. Johnsbury introduced testimony by two of its officials that it is "common" in the trucking industry—even when 30–day payment terms are required by contract—for payments "to be made over a 30–day period" (i.e., after 30 days from the date of the invoice) and that it is "[v]ery common" in the industry "that people pass the 30 day period." *In the*

*absence of any contrary evidence, this was sufficient to carry whatever burden St. Johnsbury may have had on this issue.*

*Id.* at 499 (emphasis added). Thus, the court reversed the district court and remanded to the bankruptcy court for further proceedings in the matter. *Id.* at 500.

After careful consideration, this court believes that the bankruptcy court's adoption of an analysis contrary to binding precedent in this circuit was erroneous, i.e., requiring independent evidence of "ordinary business terms" within the industry to satisfy subsection (c)(2)(C). The Court of Appeals for the. Eighth Circuit found that International's late payments were made according to ordinary business terms "because the manner, form, and timing of these payments were consistent with the practice both parties followed previously." While the court stated that the evidence was sufficient to sustain "whatever burden St. Johnsbury may have had on this issue," the court did *not* hold that subsection (c)(2)(C) requires a "comparison between the payment record of a particular debtor and the general practices in the industry regarding the time of payment."

Thus, the court believes that the bankruptcy court erred in its requirement that United present independent and objective evidence of the industry standards to satisfy subsection (c)(2)(C). While this court does not endorse this interpretation of subsection (c)(2)(C) as the more logical or better reasoned of the two views in light of the statute's construction, we are bound by the decisions of the appellate court, and so long as *Lovett* remains the law of this circuit, it is our duty to apply it to the cases before this court.

▮ And while the court, by finding that the lower court misapplied the law, is not required to address the factual findings of the bankruptcy court, the court believes the determination that no evidence of industry standards was presented was clearly erroneous. Mr. Benage testified that the manner in which USA Inns paid United "could be ordinary on those accounts ... where there's default, delinquency and

there's a workout process ...," stating that "probably eight to ten percent" of United's accounts are on a similar pay schedule. When asked whether or not the manner in which United conducted itself in dealing with USA Inns on a late-payment basis was in accordance with ordinary business terms in the savings and loan industry for this type of real estate trouble loan, Mr. Benage's uncontroverted testimony was that

> it absolutely is, and that's something that we do and have done for years.... And it's our duty, and we're mandated to do it—I mean that sincerely—by the regulatory authorities to work with people as long as they're making [an] attempt to pay and trying to pay, even though they may be in default. And that has been our position and is still our position today.

Mr. Benage similarly testified that United was encouraged and directed by regulatory authorities to work with customers in the "so-called real estate crisis that's going on across this country."

The bankruptcy court found, in fact, that "United confirmed that this practice may be the general industry standard as to delinquent customers...." Memorandum Opinion, 151 B.R. at 492. However, the court determined that "United introduced no evidence regarding 'ordinary business terms' of the industry in general." *Id.* The court stated that "United presents no evidence that late note payments are so common within the savings and loan industry that it is considered an ordinary business practice.... Therefore, United failed to prove that the payments were made according to ordinary business terms." *Id.* at 492. The court is persuaded, however, that, similar to the evidence present in *Lovett,* there was objective evidence sufficient to carry whatever burden, if any, United may have had on the issue of industry standards and ordinary business terms.

Nevertheless, the court finds that the bankruptcy incorrectly applied the requirements of 11 U.S.C. § 547(c)(2) to the appellant, United Savings and Loan Association, by requiring independent evidence "that

late note payments are so common within the savings and loan industry that [they are] considered an ordinary business practice" to satisfy subsection (c)(2)(C). The court reverses the decision below, remanding for further proceedings consistent with *Lovett v. St. Johnsbury Trucking*, 931 F.2d 494 (8th Cir.1991) and this opinion.

IT IS SO ORDERED.